SCOTT et al. v. HARDAWAY CONTRACTING CO. et al.—68 S. W.
(2d) '944.

Middle Section.   October 7, 1933.

Petition for Certiorari denied by Supreme Court, March 10, 1934.

E. W. Ross, of Savannah, and Pitts, McConnico & Hatcher, of
Nashville, for appellant Hardaway Contracting Co.

W. H. Sloan and P. M. Harbert, both of Savannah, J. A. Shelton,
of Adamsville, and Bass, Berry & Sims, of Nashville, for appellees.

DeWITT, J.   In this cause the complainants, Bob Guinn and W.
H. Sloan, administrator of L. A. Scott, deceased, were awarded a re-
covery of the sum of $8,197.63 against the Hardaway Contracting

Company and the Standard Accident Insurance Company, the surety on a bond given by the Hardaway Contracting Company to the commissioner of highways upon payment of retainage of moneys due the contracting company under a contract for road construction in Hardin county. The amount awarded represents the sum of $7,066.92, with interest from the date of the filing of the bill, April 2, 1930. This principal sum represents what is known as a bankage or wharfage charge at the rate of 6 cents per 100 pounds for 11,778,200 pounds of cement delivered by steamboats at the landing belonging to L. A. Scott and Bob Guinn at Savannah, Tennessee. The contracting company and its surety denied all liability. Their counsel insist that the determinative question in this case is:

"Whether a contract to pay for service can be implied from the existence of a local custom in a certain business, when the party sought to be charged is a stranger in the locality, was never engaged in such business, has no knowledge of such custom, and moreover when he was assured in advance by the party rendering the service, that no charge would be made for them; (and it may be added, within the facts of the case—and when it appears that the service would not have been accepted had the charge consequently made been known or suspected at the time they were rendered)."

Counsel for appellees do not agree that this properly presents the determinative question. They say:

"If this record shows the custom is local and pertains only to a certain business, is not general and the party affected thereby is a stranger to the business and has knowledge of the custom, the appellants may have some standing in this Honorable Court on the question raised as to custom; furthermore, if this record conclusively shows that there was no charge for the services rendered, that there was an assurance and an unconditional contract that no charge would be made for such services, complainants could not have recovered."

The element of custom exists in the controversy because the contracting company contends that it never agreed to pay any bankage to complainants, never knew that they intended to make such charge, and never knew that there was any custom, either general or local, in such business of charging for the use of a steamboat landing on the Tennessee river in delivering merchandise to a given place; and, furthermore, it contends that it had a specific contract with the complainants by which it was not to be charged anything for such use of the landing or wharf. The complainants contend that the charge for bankage was never waived, that the only agreement was that they would not make a charge for storage of cement in their warehouse at the top of the bank of the river.

In April, 1929, the Hardaway Contracting Company was awarded

the contract by the commissioner of highways for constructing state highway No. 15 from Savannah to the Wayne county line. The contract provided that the highway department would furnish to the contractor the cement (to be used for paving the highway) at the rate of $2.75 per barrel on boat f. o. b. wharf at Savannah, Tennessee. L. A. Scott and Bob Guinn owned the landing at Savannah, consisting of four acres of land running down to the Tennessee river, having at the top of the bank a warehouse, and having in connection therewith a tramway running from the warehouse to the river. On this tramway were two tramcars moved by a cable fastened to a drum which was turned by electric power. The cement received and used by the appellant under said contract was unloaded at this landing by employees of the steamboat company, placed upon these tramcars and drawn up to the warehouse by the machinery operated by an employee of Scott and Guinn, then the bags of cement were unloaded by the employees of the steamboat company and stacked in the warehouse by them. The landing was operated as a public landing by the complainants and, during the time in which the cement was thus unloaded and stored, other merchandise was regularly delivered and placed in the warehouse, belonging to other parties than those herein involved.

Scott and Guinn were stockholders and officers in the Dixie Oil & Gas Company, operating in Savannah and nearby towns; and they were interested in selling oil and gasoline to the contracting company when it should be engaged in its construction work. Mr. Scott was present in Nashville when the contract was let. There he met Mr. R. H. Wright, Jr., the manager for the contracting company, and told him that he wanted to see him as he was in the gas and oil business. Shortly after the contract was awarded, Mr. Wright went to Savannah and had a conversation with Mr. Scott in the presence of Capt. Rogers of the St. Louis & Tennessee River Packet Company, and Mr. McGovern of the Hermitage Portland Cement Company. Mr. Wright testified as follows:

"Mr. McGovern introduced me to Captain Rogers and said, 'Here is a man who is going to haul your cement for you,' and he said, 'We are going to put it in the warehouse. Mr. Scott has a warehouse on the bank of the river;' and I said, 'That is good, what is it going to cost?' and Mr. Scott spoke up and said, 'Its not going to cost you a cent. We are going to furnish the warehouse and Captain Rogers is going to put it in.' and I said, 'That's fine.' He said he would get me in touch with Mr. Guinn and Mr. Guinn carried me around and showed me the facilities and what they were."

Mr. Wright also testified that after Mr. Scott said that it was not going to cost anything he felt good about it, all of his troubles were

over and he felt inclined to do all he could toward his company, giving him their business, since he had volunteered to help them out. On cross-examination Mr. Wright testified that Mr. Scott told him that there would be no charge for the storage, no charge for the warehouse, and that Mr. Guinn would show him the warehouse.

Capt. Rogers testified that the only statement that he heard in the conversation was made by Mr. Scott, and that he said, "There won't be any charge for the warehouse."

Mr. McGovern testified:

"Referring to the storage of the cement in the* warehouse, Mr. Scott said there would be no charge for the storage in the warehouse, that the boatline was to perform the unloading service."

He also said that Mr. Scott made the statement that he was interested in selling Mr. Wright gasoline and oil.

From early in May to the middle of September, 1929, the cement was thus shipped and delivered, and, after it was stored in the warehouse, it was taken out and used as needed by the contracting company. That company purchased and paid for oil and gas from the Dixie Oil & Gas Company to the extent of nearly $13,000. It does not appear that the agreement for exclusive purchase of oil and gas from the Dixie Oil & Gas Company was a consideration for their making no charge for the use of the warehouse, but it was a circumstance intimately related to it.

After the agreement between Wright and Scott was made, Wright went with Guinn to the warehouse. Guinn testified that although they had a bankage charge Wright did not ask about it and he, Guinn, thought that Wright knew about it. No mention of bankage was made by Scott in the first conversation with Wright. No demand was ever made of the Hardaway Contracting Company for bankage until after the work was completed, it had moved away from Savannah and its attorney wrote a letter to it, setting forth the demand "for bankage for unloading 125,300 sacks of cement at their landing and storing same in Savannah."

When Wright and Guinn first visited the warehouse together, they agreed that it should be enlarged and Wright volunteered to pay $100 toward the cost of it. The complainants employed a man at $75 per month to operate the hoisting machinery, which was serving the public generally as well as the contracting company. It was necessary to employ a checker of the freight and Mr. Scott's brother was employed at $100 per month, one-half of which was, under agreement, paid by the contracting company and the other one-half by Scott and Guinn. Mr. Guinn testified that the improvements which he caused to be made on the warehouse property cost about $1,100.

In the original bill it is alleged:

"Complainants state and charge that they are entitled to a reasonable bankage for caring for and storing said cement, and that said defendant Hardaway Constructing Company is liable to them for this amount; that since under the contract the said Construction Company was to furnish the place to store and protect said cement, and to unload the same, it is liable to the complainants for a reasonable sum for bankage and storage. Complainants state and charge that 8 cents per 100 pounds would be reasonable, but since there was a large amount of this freight, they have only charged the sum of 6 cents per 100 pounds, which would be the sum of $7,066.92, for which the said Construction Company is indebted to them."

In their evidence, the complainants explain that the inclusion of storage as one basis for this charge was a mistake due to misunderstanding of counsel; and that they place the charge entirely upon the basis of bankage or wharfage. Their theory seems to be, if we make the proper inference, that although there was to be no charge for the use of the warehouse, nevertheless they intended to make a charge, as was their custom, for the privilege of landing the cement at their landing and transporting it over their land to their warehouse; and that they went to the additional expense with a view that they would be paid this bankage. In behalf of the contracting company it is contended that it never agreed to pay any bankage, never heard of such a charge until after the work was all over, and that the complainants expressly waived all such charge and induced it thereby to enter into this arrangement and to patronize the Dixie Oil & Gas Company exclusively, when without such agreement it might have made other arrangements.

It is evident from the testimony of complainants' witnesses that what is called a bankage charge is really a charge not only for landing goods on the wharfinger's property, but also for furnishing a place of deposit for the cargo. Complainants are claiming this entire charge and yet not denying that they agreed to furnish storage for the cement in the warehouse without charge. We may observe that the service for furnishing and operating tramcars to take the cement to the warehouse was but a part of the service for which the charge is made. Mr. Guinn himself testified that bankage is charged for the privilege of carrying goods across their land and for their having to receive them and be responsible for them while in their care until they are carried out. This charge is 6 cents for 100 pounds for letting the goods be placed on the tramcars, carrying them up to the warehouse, storing them in the warehouse, and yet the charge for such storage was waived. Clearly, therefore, the amount awarded includes at least the amount which was waived, and the extent of it does not appear from the evidence. This is a very literal interpretation of the matter. On the other hand, a fair interpretation of the

evidence is that Mr. Scott assured Mr. Wright that there was to be no charge. He was assured that Scott and Guinn would furnish the warehouse and the steamboat people would put the cement in it; and that it would not cost the contracting company a cent. This is the testimony of Mr. Wright and in this he is corroborated by Mr. McGovern, who said that Mr. Scott said to Mr. Wright that there would be no charge for the storage in the warehouse and the boat line was to perform the unloading service. It will be remembered that Mr. McGovern said that Mr. Scott then and there made the statement that he was interested in selling gasoline and oil to the company.

Mr. Guinn admitted that until he learned in the latter part of the year 1929 that the state was not going to pay his claim for bankage, he did not think of making any claim for it against the Hardaway Contracting Company; that he never thought of making such claim until the state refused to pay. He also said that he was sure that Mr. Wright did not think that the Hardaway Contracting Company was liable for it, or he probably would have said something about it. There was no meeting of minds in regard to this alleged obligation. Messrs. Scott and Guinn, if they intended to charge bankage, either against the state or against the contracting company, never mentioned it to Mr. Wright or any one else representing that company. They withheld their intention entirely. There is no evidence that they made any investigation to ascertain whether or not the state was to pay for the use of the landing. Guinn says that his impression was that the state was to pay, but he gives no basis for it. There is a claim that the contracting company paid some bankage on some piping that was shipped there, but the testimony to this effect was completely refuted. There is no substantial evidence that any one representing the Hardaway Contracting Company knew that bankage on this cement was being claimed or would be claimed against the company or against the state. The evidence shows clearly that the agreement for purchase of gasoline and oil from the Dixie Oil & Gas Company was entered into at the same time when the agreement for use of the landing and warehouse was made.

The complainants invoked, and the chancellor applied, the rule that in all contracts as to the subject-matter of which known usage prevailed, the parties are held to have proceeded on the tacit assumption of such usage, and to have contracted with reference to it, unless the contrary appears, and the usages formed a part of the contract. The chancellor held upon the evidence that there was a general custom of wharfingers in that section along the Tennessee river of charging for the use of their landing places for goods; and that the contracting company must be presumed to have dealt with reference to it and made it a part of its contract. But a custom or

usage is not admissible for the purpose of varying the terms of the special contract. Pennsylvania Railroad Co. v. Naive, 112 Tenn., 239, 257, 79 S. W., 124, 64 L. R. A., 443. If Scott and Guinn agreed to furnish all this service without charge, no custom or usage would enter into it. It was their intention to exclude the operation of such custom or usage. All evidence as to custom or usage was excepted to on the ground that the operation of it was so excluded. We are of the opinion that this evidence should have been excluded, inasmuch as we find that an agreement was made under which no charge was to be made for bankage. Scott and Guinn treated this as the agreement by never mentioning bankage to the contracting company until after it had finished its business and its agents had gone. They led it all the time to be utterly unaware that any such charge was intended. It is difficult to see why, if such charge was intended, Scott and Guinn would have remained utterly silent toward the contracting company, and at the same time made no investigation whatever to ascertain whether or not the state was to pay the charge. While the word "estoppel" is not used in the answer to the bill, yet facts are averred upon which an estoppel could be based, and this is sufficient in pleading. We are of the opinion that if Scott and Guinn intended to charge bankage, it was their duty to speak up and say so at the time of the first conversation between Scott and Wright, in which Wright was led to believe that Scott and Guinn were furnishing their landing place and warehouse without charge, and very probably because they were to receive a valuable patronage for their gasoline and oil business. That was the occasion when a clear understanding should have been had. The lack of frankness, the disingenuous conduct, of Scott and Guinn, if they intended to charge bankage, led the contracting company to adopt the course which evidently it would not otherwise have taken in arranging for getting the cement and having it delivered. This is shown in the evidence.

■ ■ We have dealt with this subject of custom or usage upon the conclusion that it was excluded by the agreement. However, we are of the opinion that the custom of charging for the use of landings along the Tennessee river was not so general, so notorious, that strangers coming to Savannah could be presumed to have dealt with such custom or usage in mind. These parties were not engaged in the same trade. There is no general presumption that the usages of a particular trade are known to persons not in that trade. 17 C. J., 459, citing cases. It is the essence of a contract that it should arise out of the intention of the parties to do or not to do certain things, and it follows that one cannot be held to have contracted to do or not to do something of which he neither had nor is presumed to have had any knowledge or notice. It is not enough that one of the parties to

the contract has knowledge of the usage, but the principle requires that both parties should have this knowledge. Elliott on Contracts, sec. 1696. In section 1697 of the same work it is said, citing cases:

"It is well settled that proof of local usages will not raise a presumption of knowledge of their existence on the part of one who is engaged generally in the business to which they pertain in a certain city, at least where the domicile of the party sought to be charged is elsewhere, or in other words in order to create even a prima facie presumption that a party has knowledge of a usage incident to a particular business about which he is engaged, the usage must be shown to be a general one in that business, in such sort as that it would be unreasonable to suppose he was ignorant of it."

For these reasons we think that these complainants are not entitled to recover this charge against the appellant.

The assignments of error are sustained and the bill is dismissed. We are not prepared to hold that the claim was prosecuted in such bad faith and with such malice, that the complainants and their sureties on their cross-bill would be liable for the expense of counsel fees and damages incurred by the Hardaway Contracting Company and its codefendants in the defense of this suit. Therefore the assignment raising this question is overruled. The decree of the chancery court is reversed and the original bill and the cross-bill are dismissed. The costs of the cause, including the costs of the appeal, will be adjudged against the complainants and the sureties on their prosecution bond.

Faw, P. J., and Crownover, J., concur.